Here on file A.C. Superdash 24-0577, Dan Macuro and Michael White, plaintiff, Appellee v. CF Eagle Brook Arcis, LLC, doing business as Eagle Brook Country Club Defendant Attorney. Arguing on behalf of your client, Mr. James Dasso. Arguing on behalf of the appellee, Mr. Matthew J. Hartman. All right, counsel for the appellant, you may proceed when ready. Feel free to adjust the microphone if needed. Thank you, your honor. Good morning, your honor. Good morning. Your honors, James Dasso on behalf of CF Eagle Brook Arcis. May it please the court, counsel. As the court knows, we're up here on the issue of whether or not amended country club rules and regulations should govern whether the case below proceeds in the circuit court or should go to arbitration under the American Arbitration Association rules. We believe the circuit court erred by not enforcing those rules and holding that the plaintiffs in this case were not subject to arbitration. What year did that arbitration clause come in? It was 23, if I get my years correctly, it was a little over a year before the suit was filed. So if I remember correctly, 2023 was when it came in. 2023, okay. No, I'm sorry. I'm losing track. I'm getting old and I'm losing track. 2022? 2022 would have been when it came in. 2023 was when the lawsuit was filed. Right. It was approximately a year and a couple days before the lawsuit was filed. And it was nine years after Mr. White resigned. Correct. Okay. It was. He resigned in 2013, so it would have been some period of time after he resigned. And Matura, was he resigned just or left the club just before the lawsuit basically? Correct. So in terms of the chronology, he would have left after the rules were amended. Correct. But before, I mean shortly after the lawsuit was filed as well. So in our view, before I got into the particular contractual provisions at issue, I wanted to start with kind of the background here. And that is there was this underlying view, I think, in the circuit court, that arbitration was giving up some sort of rights for something that the plaintiffs had. And I don't think that that is the law in Illinois at all. In particular, the Supreme Court of Illinois has indicated that Illinois public policy favors arbitration and that arbitration is something that provides an alternative for them that can be faster, can be quicker, can be cheaper than litigation in circuit courts. So this idea that arbitration is something to be avoided or something that is giving up fundamental rights I don't think is the appropriate background on which we're painting or which we're looking at as we move forward today. Turning then to the particular facts at issue and why we believe that this arbitration clause should be enforced against both Mr. Mottrell and Mr. White, I wanted to start with what was the contractual provisions that were in place? What were the membership rules that were in place at the time that both of these gentlemen admit that they were subject to the rules? Let me ask you first. In terms of the arbitration position, before the arbitration, according to, I think, that 2022 amendment, there are, I would say, informal negotiations that could come first, then arbitration, or mediation, then arbitration. Is that the way it's set up in the rules? In the 2022 amendments, there's an entire dispute resolution procedure process that should be followed. Basically, a claim notice is served on us indicating what their claim is, then there's a period of time where there's negotiation, then there's mediation. But it wouldn't go directly, in most cases, to arbitration. It should go through, I won't say exhaustion of remedies because that would not apply in this case, but there is a procedure that is generally followed, and for the most part, it was followed here by both White and Mottoro. So here's what I would say to that, Your Honor. In a lot of these arbitration cases, and I've done a lot of them, what happens is that you have kind of this informal process that is provided in the contract before you get to arbitration. The hope is that you'll have some sort of resolution before you get to arbitration because the basic driving force behind these ADR provisions is to make this cheaper and more effective and get to a resolution more quickly. What you said, though, as you started your process or started your argument, is that this arbitration would be quicker, but if they had gone through informal negotiations and then mediation, which would be next, then arbitration is not necessarily going to be quicker than litigation, is it? Less expensive because you're going to have to hire, are you going to hire a mediator, and then you're going to have to pay an arbitrator, correct? Well, in any given case, arbitration can turn out more expensive or less expensive, but generally, alternate dispute resolution processes, I believe, my experience certainly, and I think what the courts indicate is that they generally are less expensive. In this particular case, again, there's informal negotiations. That should happen any time before you file a suit, absent real extrinsic circumstances. If you have a commercial dispute, you should try and resolve that first, and that's always probably going to be the cheapest and less expensive and fastest way to get a resolution. Then there is a mediation process, and that mediation process can take some time or it can be very quick, depending upon how quickly things go, and the provisions of the contract do require a mediator, and again, that, again, is designed to have a resolution before there's even an arbitration. So if you look at the process as a whole, the goal certainly is to get these done either in the informal discussions or in the mediation, and you're clearly way ahead of the game. If you then go arbitration, is it going to be longer or shorter? Well, my experience is that I have a number of arbitrations right now, and even the most complex ones generally take a year or only slightly over a year. We've already been at this, as Justice already indicated, some time now. I even lost track of the number of years we've been at it, since it's 2023 and we're in 2025. So I would suggest it certainly would be longer to go to litigation here, and I certainly think it's going to be more expensive because we're going to be up and down, and then at some point in time, we're also going to have to deal with the merits of this case, which we haven't even gotten to yet. So I would say, in general, ADR provisions are more effective, cheaper, and quicker, and I think in this case, probably that's the same conclusion we would reach here in terms of what's happening in this case. So, counsel, let's get to the membership plans then. So at the time that each of the plaintiffs here became members, there was no arbitration clause in place at the time, right? Correct, Your Honor. One of the things I want to be clear about is that the facilities continued for some time, but there was different purchasers who owned the club, and really, as the trial court recognized, different incarnations of the club as it went along. And these are not contracts in the sense that, you know, take an employment context where, you know, on condition of employment, they establish a contractual relationship. Are you saying that these membership plans were, in effect, contracts that the plaintiffs were bound to? Correct. Okay. These are in the terms and conditions under which membership access to the facilities are provided. That's why in our – we didn't find any cases right on point, not surprisingly that people are fighting about country club dues, but we did find a number of cases where people are entering into business or commercial relationships, and basically the provider of the services or provider of the goods says, here is our contract, here is what we're willing to provide, are the terms and conditions on which we're willing to provide services. And the courts hold that is, in fact, a contract injury. All right. So then the membership plans in place at the beginning of the relationship included clauses saying that, essentially, the club in whatever ownership had the unilateral right to make changes. Correct. There were multiple different versions of the membership agreement before 2022, and in each of those there was that provision, which makes sense, because if you're a country club, you may want to change or update the terms and conditions of membership from time to time. You may want to change – as the membership grows and things change, it makes sense that you're going to reserve that right, and that's something you're going to continue to do over time. So as the contracts, just to put it back in that framing, as the contract is modified by one party, does that need to be accepted then by the other party? So I would say the law says no in Illinois, and in particular we focus on the Miracle Pound case, which is a federal court case, but it's applying Illinois law. And in that case, I think it very clearly says that there's a rejection that there's any sort of mutual assent that's necessary when you have this sort of unilateral provision in that case. But you do need notice. I don't believe you necessarily do. I do believe that you have – that notice was provided here, so I'm not arguing we didn't provide notice. How about the professional executive center case? Do you distinguish that case where it says that you're supposed to post on the website or at the club? So I don't remember the specific circumstances of the professional center case, but the cases that were generally cited in all the briefs dealt with kind of the website situation, where there's ongoing website issues. Did they do that here? Did they? Was there notice here on all these changes? I'm sorry, I didn't mean to interrupt you. I apologize. There absolutely was notice. We believe that there was notice both consistent with the law in Illinois and consistent with the terms of the 2010 provision of the membership agreement. As I said, I think if you read the Miracle Pound case, it says when you have this, when you have a contract in place, that as a unilateral modification provision, you don't need notice. So I would say that's our position, and I believe that that's backed up by the Miracle Pond case. I'm sorry, I know I'm interrupting you. You finish that. No, but despite that, we did get notice here by posting it in the section on our website that deals directly with membership issues. How did Mr. White know that since he resigned nine years previously? Well, I would say that's the first place you would go is either you would look at the website or you would go back and talk to the people who are running the club and say, can I get a copy of your current rules and regulations? And I would say that the membership rules for 2010 do say that the club's administration will maintain a current version of the rules and regulations. So if I was someone who had resigned from membership privileges years earlier and I wanted to find out what the current rules are, I'd either access the website or I would ask the administration. And I'd make one other point, Your Honor, before it looks like you have another question. But one other point is you can check the website even if you're not a member. That's exactly what happened here when counsel checked the website of a different club in Denver and presented that to our administration during his deposition. So if you look at the 2010 membership agreements, which applied to both of these individuals before they resigned, I want to focus the Court's attention specifically on the preamble and on Section 1.4a. 1.4a says the members agree to be bound by these rules as presently enacted or hereafter amended. So the idea that by participating in the club, you are acknowledging there could be future amendments and you are agreeing to abide by those amendments in the future. And the preamble says it is the duty of the membership to know its rules and to cooperate with the club management and staff in enforcement of those rules. So the membership of the club has an affirmative duty to find out what the rules are and to go ahead and act consistently with those rules. So what does that mean with respect to Mr. White? I think, very simply, he should have said what is the current membership rules, asked for those rules, and then followed those rules before filing the lawsuit. And again, I don't want to jump too far ahead to Kinkle, but I also don't want to lose my time before we get to Kinkle. I don't think Kinkle says anything otherwise. Because our view of the Supreme Court's decision in Kinkle is that it does not apply in this particular case. In that case, there was a telephone arrangement, and that was completely done by the time there was any litigation going on. There was a termination done, and the early termination fee was paid. Here is something completely different, where there is an ongoing contractual relationship, if you believe Mr. White, even after he stopped being an active member in the club. He continued to claim to have rules, and he continued to have rights in the club to have obligations with him in the future, and therefore he says that the contract continued to still apply and still give him rights. And our view is that when that happens, Kinkle does not apply, but rather there is an ongoing contractual relationship that can be modified. Essentially, are you saying that the 92, which was the year of the first payment in the 95, when there was significant building on, I guess, the clubhouse, some version of the clubhouse, but in 92, when it says you're going to get that money back after 30 years, that doesn't really mean you're going to get that money back after 30 years. So the 92, everyone agrees that the 92 membership agreement is null and void. When the 1995 membership plan came in, there was a conversion agreement signed, and that conversion agreement says if you convert your rights into the current club, you will be... But they were both members in 95. They were people who were members... And they paid in 95, by the way. They both paid in 95, right? So, Your Honor... How do you finish your sentence where you said, if you covers your agreement, you'll be what? You were going to say in 95. So I forget that particular sentence, Your Honor, but maybe let me try it this way. What happened is, is in 92, there was a payment made when they first joined a club. Then there was a new owner and essentially a new club. Same facilities, but a different club in 1995. In 1995, to become a member of the new club, they had to sign a conversion agreement and agree to be bound by the 1995 membership agreement. That conversion agreement, as well as the 1995 membership agreement, expressly provide that the 1992 membership agreement was null and void and that they would have no further rights under that particular agreement. But they paid in 95. They both paid in their 9,888 or whatever. Anyway, that payment's not at issue. So the payment they made after they became members of the club in 95 is not at issue. Maybe the timing of it is at issue. Is that a 30-day thing?  But the time – I'm sorry. No, no. I apologize. Finish that sentence. The only thing that would be good is two payments. There's one after the 95 agreement. That one, there was no – they would be paid back that. The question is whether or not they were obligated – were obligated to pay back the earlier payment in 92 that was paid to a different club before the club changed in 1995. So I will reserve anything else on this. Thank you, counsel. You'll have five minutes in rebuttal. Counsel for the appellee, you may begin when ready. Feel free to adjust the microphone if you need me. Thank you. Good afternoon, and may it please the Court. Matthew Harmon on behalf of the appellees, Mr. Motturo, Mr. White. And, of course, this is really a contract formation modification issue. Counsel will talk about arbitration and arbitration being favored. While cases have said that for years, the Supreme Court in Coinbase v. Suskie in 2022 have said what that really means is to put arbitration agreements on equal footing with other contracts. There are no contract formation issues or modification issues that specially require the circuit court or this court to prefer arbitration. To the contrary, I would say, both the Illinois Supreme Court and the Illinois Supreme Court have unequivocally said arbitration is about consent, not coercion. And that's the real underlying issue here. Did my clients consent or agree to an agreement that had a dispute resolution process in it? So their position is that they had previously agreed to unilateral modifications by the club. So what's your position on that? Simple, Judge. They spent a lot of time in their brief, and they talked about it, but I didn't hear it said once in the argument. They say the circuit case is to allow unilateral change in term provisions when the contracts are at will, meaning it can be terminated by either party at either time, and that's extremely important. And it makes sense as a rule that you would allow change in term provisions when the contracts are at will because if you tell me you're changing the agreement and I don't like it, I'm free to quit. I don't have to be bound by that. Is there not a difference between Machuro and White in light of the fact that White wasn't even a member? Absolutely, Justice. And I think the Kinkle case is right on point. What happened was someone subscribed to Singular in 2001. In 2002, they apparently didn't like the service, resigned. I guess they had to pay a termination fee pursuant to that agreement. And then in 2003, the agreement was amended, and then the subscriber filed a suit, and Singular's position was the position they're taking here, that the agreement when they filed the suit should apply, and Kinkle unequivocally said no. The relationship was terminated. They terminated the agreement. A modification needs all the elements of a regular contract, offer, consideration, offer, acceptance, consideration. There's no offer, acceptance, or consideration for Mr. White or the plaintiff in Kinkle when they've already terminated the agreement. And I'd also suggest that would lead to absurd results. Mr. White's down living in Florida, been gone for 10 years, and they want to assert that he's still subject to the contract. They could do anything they wanted to them. They could say, oh, members, pay us 5 grand a month. Pay assessments. But aren't they, at least in the brief, and I didn't hear a great deal about it in the argument, but in the brief they're saying, hey, if they want to take advantage of their contract to get their money back, they have to come into the club and abide by the current rules. I disagree. There's not a case out there that says that. They have to abide by the contract that was in place when they resigned. And that's what we're prepared to do. And what's your position on the 1992? The 1992 agreement is null and void. The 92 agreement said they would get 75% of their money back when they left. When the conversion agreement happened, it also said you get all the rights and privileges under the 95 agreement. And the 95 agreement says you get 100% of your money back 30 years from the date of acceptance. This isn't a new club. I heard a bunch of talk about that. No, it's had several five years. It's had different owners, but this defendant promoted the 30th year anniversary in 2022, promoted the 25th year anniversary in five years prior. They sell memorabilia on it that says established in 1992. So the idea that this is a new club, that's just a red herring. The other thing I'd like to point out, counsel mentioned that something that I did when I submitted the affidavit about another site. Mr. White couldn't go to evilbrook.com and log in. It's behind the membership portal. You need a password. The only reason I found the Perdera agreement, which is another Arcus club, it was the only one that they didn't place it behind a membership portal. I looked at one agreement. The only one available on Arcus that I could find, because I didn't believe the contention that this was some part of some global plan to update the membership agreements that mysteriously happened after 10 members start inquiring about the return of their earnest money. So that's when I looked, and I said, well, look, here's an agreement from 2017. We're now taking Mr. Evans' debt in 2014 or 2024. Why hasn't this been updated? And by the way, it still hasn't been updated because I looked at it last week. But his position is that you don't need notice. Well, I think that's obviously incorrect. There's two types of notice, and I hope we're not confusing them. One is that this is going to go in effect on a certain date. I don't think we're entitled to that type of notice. But to do what they're trying to do and have our continued use of the club bind us as approval of the amendment, you clearly need notice of that. I mean, you're taught first day of law school, past consideration is no consideration. They're saying because he used the club, as we're now talking about Mr. Maturo, of course, he had sent it. But the language says you've got to post it at the message boards outside the locker room where members that are using the club would see it, or you send it in the monthly newsletter. They didn't do that. They posted it on a website that nobody uses. The website is a marketing tool to try and generate new members. It's got pretty pictures of the halls and pretty pictures of the pool and the dining room. But members don't need that or use that. And I think that was... But that's their website. It's their website. Why would Mr. Maturo go check the website? The agreement hadn't been amended in 14... But White would have had access to the website. No, he would not have because it's behind, as Mr. Evans testified... So then it's not used for marketing. No, no. I guess we're talking past one of those. Mr. White's no longer a member. Correct. To get where you have to go for Eagle Brook to see the rules and regulations, you need a login and a password. But you said they posted it on a newsletter. No. The agreement says, the 2010 agreement says the terms can be amended by, one, posting it on the message boards at the club where members would see it, or two, emailing it to the members in that monthly newsletter. Because that's how the club communicates with people. I went through a whole series of things with Mr. Evans on how you could have were emailed monthly updates, your bills are emailed, and tellingly, the day of Mr. Evans' deposition, there was a water main break at the club, and they couldn't serve food, so they had to let members know. What'd they do? They emailed them, and they pushed the message through on the club app. They didn't put a message on the website. So, Counselor, you're saying regardless of the membership status of either of the plaintiffs, they did not receive either the newsletter, and they would not have been present at the club to see it posted? No, Justice, that's not what I'm saying. Okay. What I'm saying is, if they wanted to amend the terms and give notice as they were required to in 2022, they amended it. And they put it on a website, but they did not post it in the newsletter and didn't physically post it at the club. Correct. And that's what the agreement said. And I submit, if you look at the timing, we've got 1998. It's not changed for 12 years. How often is he supposed to go and look? Monthly? Yearly? Mr. Machuro could still get into the clubhouse because he did not resign until sometime in 2023 after the lawsuits filed. Could Mr. White get in if he came back to Illinois? Could he get into the? As a guest. Okay. But, you know, he's down in Florida living a happy life. And another thing, the actual 95 agreement said the money would be paid to you or your heirs. They even contemplated you might be dead by the time this 30 years rolled around. There's no requirement that you have to be under contract or bound by them in order to get it. It's plain and simple. They got a 30-year loan.  So the provisions you're talking about from notice are what were in the agreement prior to the modification in 2022. Correct. There's two provisions in the 2010 agreement that say. Okay. So the 2010 agreement, was there offer acceptance consideration for that one? Full audit by Machuro and White. We're not disputing that the 2010 agreement applied to them. Okay. Absent a contract to the extent of notice or the type of notice, do you agree that their conception is no notice would otherwise be required? So take out the contractual provisions on notice. They've said when you've already agreed to a unilateral modification, no notice. I would disagree with that. I would say that's a misstatement of the law. The case I cited, Garber, a modification needs all the elements of a contract formation. Again, I think that case is most likely talking about notice as in we're putting this in effect today, as opposed to we're putting this in effect in 30 days or 60 days. They have the right to change it then on the spot, but they're going to tell us about it. I mean, I can't imagine. I think it defies every principle of contract law to say that you're going to be bound by some potential change that you don't know what it is, and then nobody tells you about it, and you're stuck with it. Can the notice be constructive rather than actual? I would submit in this case, no, because there are provisions in the agreement that said how they were going to do it. Now, if they actually did it, would they have a much better argument? Yeah. If they would have given actual notice, then there might have been no harm, no foul. But to say that Mr. Matero should have gone on some website and checked something that hadn't been changed in nine years, I think is absurd, particularly where the agreement says this is how we're going to do it. We're going to e-mail it to you in the newsletter, or we're going to post it, or you're going to see it when you walk into the locker room every day. So, and again, I think, well, I want to go lastly to the notion that this arbitration provision is being enforced because it's more cost effective. I think your honors, your justices have appreciated the timing of this, and my client and 10 other people are asking about it. I believe the class is 100 people. That's what they said they had as members in the month in June of 1995. The agreement clearly says under the commercial rules of AAA, you've got to have the meeting, then you've got to pay for a AAA mediation under the commercial rules, not consumer rules. It would be much cheaper or some other form. And then if that doesn't work, you need a AAA arbitration with a retired judge that is familiar with their business, and you've got to pay half the cost. And we all know what that's going to cost. If they really wanted to do 90 mediations, 90 to 100 mediations, followed by 90 to 100 arbitrations, they would pay AAA more than what's at dispute here. This was implemented to suppress these claims because no lawyer is going to take a claim for $9,250 where you've got to pay several thousand dollars for mediation and arbitration, and that's why it was put in. And they tried to hide behind this was put in because it was a corporate-wide thing, and it simply wasn't. So unless justices have any more questions for me. Where's the arbitration to take place? Is there a state place? It didn't. My recollection, just as it says, that was kind of weird language, but it clearly said under the consumer rules under AAA, but not its boss places as amended herein, which additionally I should point out allow for discovery, allow for depositions, allow for dispositive motions. I mean, the trial court never reached this, but the fact of this issue was, of course, this was unconscionable, both procedurally from the way it was implemented and substantively because it makes it cost-preventative. Thank you. All right. Thank you, counsel. Thank you. Counsel, for the appellants, you're both. May it please the Court. I have five points that I wanted to make. First of all, I want to direct the Court to the specific instance where I'm referring to about the notice and what the law is in Illinois, and it's the Miracle Pond case, which is a 2020 Lexis case, 86083, cited in our brief at page star 16. And the United States District Court says, Illinois courts have additionally rejected the argument that notice of amendment is necessary to create mutual assent to the amended contract. On the contrary, when the parties agree in advance to allow unilateral modifications to the terms of the contract, subsequent modifications are binding regardless of whether the other party later assents to the change. So, counsel, that is a statement of general law, but where you have a prior agreement that has notice requirements, are the parties not bound to that? So, this is always in the case of a prior agreement because there's a unilateral modification provision assumed, which relieves you of the notice. I was turning to what's obligated here in terms of the notice. There is no specific requirement in terms of how we give notice. It says we may give notice, so it says you can do these things, but it's not required. In addition, he keeps saying it physically requires posting at the club. The language does not say that. It says posting at the club, and I would suggest that putting it on the website, which is the club's website, which is where you put all of the notices and all of the information about the club's rules and regulations, and everyone knows that, is posting at the club. So, I do think we need, I don't think that the terms are requiring a specific form of notice. It says may, and even if it does, we need that because posting at the club, I believe, encompasses very clearly in this digital age, posting on the club's website. And does everyone have access to the website? Everyone as a current member has access to the website. So, Mr. White would not have had access to the website? Mr. White could have requested access to it if he wanted to go back and get access to it. And then, again, he keeps saying, why would Mr. White or anyone else look up the memberships? And I'll tell you, I've had a membership of a club for 20 years. I've never gone back and looked at the membership things, but if I was going to file a lawsuit, that would be the first thing that I would do. I'm going to make sure that I'm doing things consistent with the membership of the club and how things operate. So, that's the reason why either Mr. White or Mr. Petrua would go look at the website, is because they're going to file a lawsuit, so they need to do that in compliance with the terms of the law. You don't bill on the website. You bill individually to, you know, your monthly membership, your dining. Those aren't on the website. I don't know that one way or the other. Well, they wouldn't be. How could it? I mean, that would be very difficult if you have 400 members, 500 members. Well, my understanding is we get e-mails. My wife pays the bills, but my understanding is we get e-mails with our kind of membership thing. But I know, again, the point here is if you're ready to file a lawsuit and you've agreed that you're going to file a lawsuit about the terms of memberships, the terms and conditions of memberships, consistent with those terms and conditions, the first thing I would do is go look and see what the terms and conditions are. You have every reason in the world to go do that. Plus, you're on inquiry notice because you've agreed in the 2020-2010 provision that you would affirmatively keep yourself apprised and comply with the current terms of the membership.  So the notice clause includes the word may. So you're saying that may makes the notice optional? I would say may is permissive. We can provide notice in these ways. So may doesn't refer to the method of notice? It does refer to the method, but it says these are ways we can notify you, not these are ways that are required that we do notify you. So should we see your argument that the may makes it optional to provide any notice in any form? So our argument is that the unilateral modification provision means that there's no notice required. That's the miracle pound case. Then there is no affirmative obligation to provide notice in sections 1.4 and 12.8 because those are permissive. And again, right within the same sections there, they use both permissive language may and requirement language will. And we point that out in our brief, is the parties very clearly knew what one language meant and what the other language meant. I think we only got to one out of five, but I'll give you time to summarize any points you want to bring up very briefly. Yeah, I really think I got to most of them, Your Honor, other than the one point I want to be very clear about, which is the application of the Kinkle case to Mr. White. I would ask the court to look at the Callahan case, which we cite in our brief. And in that case, sort of the same thing happened, and that was there was an ongoing business relationship. That business relationship ended, but there were still claims that the parties owed each other obligations and stuff after the end of the business relationship. And in that case, the business relationship ended in March of 2018, and there was a subsequent agreement between them to modify the agreement in April of 2018. And that court held that that April 2018 modification was in place and effective, even though the business day-to-day business obligation had ended because there were still ongoing claims of rights and obligations under the contract. That's exactly what we have here, is that the day-to-day use of the membership privileges had ended for Mr. White, but he still claims there was ongoing obligations under the contract, so the contractual relationship continued in place. And therefore, if you're going to sue under the contract later on, you have to comply with all of the terms of the contract. And he specifically agreed to comply with all of the terms of the contract as amended. That's specifically what he agreed to in 2020. So, again, Your Honor. Thank you. Thank you very much. Thank you, counsel. I want to thank counsel for their arguments. We will take this matter under advisement, issue a disposition in due course.